IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| MARIAN J. MENSIE, on behalf of herself and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>TOYOTA MOTOR CREDIT CORPORATION,<br><br>and<br><br>AUTOMOTIVE WARRANTY SERVICES, INC.<br><br>Registered Agent:<br>Corporation Service Company<br>300 Spring Building, Suite 900<br>300 S. Spring St.<br>Little Rock, AR 72201<br><br>    Defendants. | Case No. 4:17-cv-00085-DPM<br><br>JURY TRIAL REQUESTED |

## AMENDED COMPLAINT - CLASS ACTION

Plaintiff Marian J. Mensie, by and through the undersigned counsel, on her own behalf and as a representative of a class of persons similarly situated, pursuant to the Court's June 27, 2017 Order, files this Amended Complaint with her causes of action against Defendants Toyota Motor Credit Corporation and Automotive Warranty Services, Inc., and states and alleges as follows:

### PARTIES

1. Plaintiff Marian J. Mensie is, and at all times herein referenced was, an individual residing in Pulaski County, Arkansas.

2. Defendant Toyota Motor Credit Corporation ("TMCC") is, and at all times herein referenced was, a California company registered to transact business within the State of Arkansas, transacting substantial business in Arkansas, with its principal place of business located at 19001 S.

Western Ave., Torrance, California 90609, and available for service of process via CT Corporation Company, 124 West Capitol Ave., Suite 1900, Little Rock, Arkansas 72201.

3. According to SEC filings, TMCC, is financial services firm with $114.7 billion in assets. It also purports to be one of the largest consumer finance companies in the United States.

4. Defendant Automotive Warranty Services, Inc. ("AWS") is, and at all times herein was, a Delaware company registered to transact business within the State of Arkansas, transacting substantial business in Arkansas, with its registered agent at Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Spring St., Little Rock, Arkansas 72201.

## JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because:

   a. This is a civil action filed pursuant to Fed. R. Civ. P. 23 brought by one or more representative persons as a class action;

   b. The amount in controversy of all class members in the aggregate exceeds the sum or value of $5,000,000.00, exclusive of interest and costs;

   c. Many members of the putative class are citizens of States other than California, which is the State of TMCC's residence, or Illinois, which is the State of AWS' residence, and

   d. All other factual conditions precedent necessary to empower this Court with subject matter jurisdiction and personal jurisdiction have been satisfied.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District, Plaintiff resides in this District, TMCC and AWS transact a substantial amount of business in this District, and TMCC and

AWS otherwise have sufficient contacts with this District to justify them being fairly brought into this District.

## FACTUAL ALLEGATIONS WITH RESPECT TO ALL COUNTS

*The Defendants*

7.     This class action arises from TMCC and AWS' breach of their form contract related to consumer "gap" protection against vehicle loan deficiency balances.

8.     TMCC provides auto loans and financing to consumers so they can purchase vehicles from auto dealerships, such as Landers Toyota in Little Rock, Arkansas.

9.     AWS is a gap warranty company that sells and/or administers gap contracts issued in conjunction with consumer auto loans.

10.    When a consumer purchases a vehicle from an auto dealership, the consumer and dealership enter into a retail installment contract ("RIC") that governs the financing arrangement for the vehicle.

11.    After a consumer and dealership enter into an RIC, traditionally the dealership will immediately assign the RIC to the credit division of whichever auto manufacturer the dealership is associated with, such as Toyota Motor Credit Corporation.

12.    After such assignment, the creditor organization, like TMCC, then stands in the shoes of the dealership with respect to being a party to the RIC.

13.    RICs generally provide that the borrower will make periodic payments to their lender for a specified term, and also set forth the principal, interest rate, total amount financed and the various charges built into the financing plan.

*How Defendants' Market And Sell Their Gap Policies*

14. In exchange for a specified premium, AWS and TMCC offer consumers the option to purchase "gap" protection when they are buying and financing a vehicle.

15. Gap protection has been generally described as a contract "designed to cover the difference between what your insurance carrier will pay and what you actually owe on the car if you have an accident and the car is totaled,"[1] or "the difference between what you owe on your car and what your car insurance company is willing to pay for it — without any maximum payout stipulation."[2]

16. TMCC describes gap protection as a product that, "will waive or pay the deficiency balance (minus certain fees and charges) between the amount still due on your finance or lease contract and your auto insurance settlement" if the customer experiences a total vehicle loss due to damage or theft.[3]

17. TMCC informs customers through its website that gap protection is designed to "help protect you from coming out of pocket to pay expenses you may face with a total loss."[4]

18. Unlike true gap insurance policies sold by insurance companies, defendants' gap protection comes in the form of a written standardized contract addendum to the RIC (hereinafter referred to as the "GAP Contract").

---

[1] Webpage of the Arkansas Attorney General, available at: http://arkansasag.gov/programs/consumer-protection/my-vehicle/gap-insurance.
[2] Webpage of Allstate Insurance, available at: http://www.esurance.com/insurance-coverages/gap-insurance.
[3] *See* TMCC Guaranteed Auto Protection Brochure, a copy of which is attached as Exhibit 1 to Doc. #1. Ms. Mensie does not presently recall receiving a copy of Ex. 1, or seeing Ex. 2 referenced below, prior to her purchase, but she is actively searching for additional materials she received from the dealership during the purchase.
[4] *See* TMCC's "Guaranteed Auto Protection" webpage, a copy of which is attached as Exhibit 2 to Doc. #1, and is available at:
https://www.toyotafinancial.com/pub/w/planning_center/vehicle_protection_plans/guaranteed_auto_protection.

19. A consumer desiring to purchase defendants' gap coverage simply executes a GAP Contract that becomes part of their RIC on the vehicle, and the gap premium is typically rolled into the total loan amount financed by the consumer.

*Defendants' Gap Policies Are Deliberately Opaque and Ambiguous*

20. Although the concept of gap coverage is fairly simple, defendants misinterpret and misapply the terms of their GAP Contract.

21. The Gap Contract states that if the consumer's insurance company deems the consumer's vehicle a total loss, the consumer is only responsible for paying defendants two amounts. First, the Gap Contract says the consumer is obligated to pay defendants:

> 1. A) The **Value of the Vehicle** as determined by the physical damage insurance company on the **Date of Loss** plus any physical damage insurance deductible over $1,000 which reduces that settlement . . .

22. For purposes of this section of the GAP Contract, "Value of the Vehicle" is a defined term that essentially means the value the consumer's insurance company placed on the vehicle the day it was totaled. This section essentially requires that the consumer is obligated to pay defendants whatever amount the consumer received from their insurer for the loss of the vehicle.

23. However, defendants' Gap Contract refers to another amount in subparagraph 2 of that same section, which states:

> 2. In addition to the above, **You** will be responsible for any portion of a **Deficiency Balance** that results from the **Amount Financed** or **Capitalized Cost** that exceeded 150% of the **Retail Value** of the **Vehicle**.

24. Although already written in a convoluted manner, the opaqueness of that term becomes obvious when the defined bold terms are substituted with their definitions, resulting in a clause that states:

5

> In addition to the above, [the Customer indicated with the INFORMATION SCHEDULE who financed or leased [the Vehicle indicated with in the INFORMATION SCHEDULE] or an individual to whom this Amendment is transferred in cases of [selling Your Vehicle to a person who assumes the obligation to pay payments to the Lienholder who purchases or accepts assignment of the original Contract. Transfer of Equity does not apply to refinancing]] will be responsible for any portion of a[n] [amount obtained by subtracting the [the value on the Date of Loss as determined by the physical damage insurance carrier in the event of a [loss because of theft or accidental damage to Your Vehicle, one of the following occurs: (1) Your Vehicle is declared a Total Loss, or is declared stolen and not recovered within thirty (30) days of the date of the theft by Your physical damage insurance carrier, or (2) no physical damage insurance is in force and Your Vehicle is stolen and not recovered within thirty (30) days of the date of the theft, or (3) no physical damage insurance is in force and the total cost to repair Your Vehicle as a result of an accident is greater than or equal to its cash value immediately before the accident as determined by the NADA Used Vehicle Price Guide as of the Date of Loss] and does not include towing charges, rental fees, storage charges, administrative fees, salvage value or any prior damage deductions. If no physical damage insurance ins is force on the Date of Loss, the Value of the Vehicle shall be determined using the current edition of the NADA Used Vehicle Price Guide] (less Your physical damage insurance deductible up to $1,000 is applicable), from the amount You owe Your [entity that purchases or accepts assignment of the original contract. Lienholder does not include an entity that pays-off the original Contract] based on the early termination provisions of Your Contract due to the Total Loss of Your Vehicle] that results from the [total "amount financed" in the original retail installment sales contract] or [the total "adjusted capitalized cost" in the original lease contract] that exceeded 150% of the [Manufacturer's Suggested Retail Price for new [Vehicle indicated with in the INFORMATION SCHEDULE] and the NADA Retail Value for pre-owned [Vehicle indicated with in the INFORMATION SCHEDULE] as of the [Date You sign the Contract to purchase or lease Your Vehicle and the effective date of coverage as indicated with the INFORMATION SCHEDULE] of [the Vehicle indicated with in the INFORMATION SCHEDULE].

25. This clause is so opaque it is nonsensical. A deficiency balance is the amount owed on a vehicle loan after a total loss of the vehicle and after applying the consumer's insurance proceeds towards the balance of the vehicle loan. Therefore, the deficiency balance is a determination that can only be made <u>after</u> the consumer totals their vehicle—it is clearly not an amount that can be determined when the consumer enters into a Gap Contract when they first purchase the vehicle.

26. Furthermore, it is not possible that any portion of a deficiency balance could "result from" the amount financed. The amount financed is calculated when the borrower takes out the loan, but the deficiency balance can only be calculated after a borrower's car is totaled. It is not feasible for the amount being financed at the outset of the Gap Contract to somehow "result from" a deficiency amount that is only calculable at some unknown date in the future.

27. The only reasonable interpretation of this clause is that, to the extent a deficiency balance exceeds 150% of the amount financed <u>at the time the deficiency balance is calculated</u> (i.e., after the vehicle is declared a total loss), then the borrower is responsible for paying any amount over that 150% benchmark. Otherwise, the ambiguities in this clause must be construed against defendants.

*Plaintiff Falls Victim To Defendants' Tactics*

28. On June 28, 2014, Plaintiff Marian J. Mensie purchased a new Toyota RAV4 vehicle from Landers Toyota dealership in Little Rock, Arkansas.

29. Ms. Mensie's purchase was financed through TMCC for approximately $41,900.00. A copy of Ms. Mensie's RIC is attached as Exhibit 3 to Doc. #1.

30. In addition to the cost of the vehicle, Ms. Mensie also paid a separate and additional premium of $695.00 for a GAP Contract with defendants. Ms. Mensie's GAP contract is attached as Exhibit 4 to Doc. #1.

31. At no point during her purchase of the GAP Contract was Ms. Mensie informed that she would always owe more than $2,000 on her vehicle loan if her insurers' payment did not satisfy the loan balance, irrespective of her GAP Contract.

32. At no point during her purchase of the GAP Contract was Ms. Mensie informed that she would always owe more than $2,000 on her vehicle loan if her insurers' payment did not satisfy the loan balance, irrespective of when her car was totaled.

33. At no point during her purchase of the GAP Contract was Ms. Mensie informed that she would always owe more than $2,000 on her vehicle loan if her insurers' payment did not satisfy the loan balance, irrespective of the value of her vehicle when it was totaled.

34. Ms. Mensie's RIC was assigned by Landers Toyota to TMCC immediately after Ms. Mensie purchased the vehicle—the assignment is clear at the very bottom of page 2 of the RIC, where it states "This contract is assigned to TMCC without recourse or with limited recourse under the terms of the 'Seller's Assignment' on the reverse side."

35. That "Seller's Assignment" in the RIC makes it clear that Landers Toyota assigned "**all of its right, title and interest**" in the RIC to TMCC. Ex. 3 to Doc. #1, p. 4. The RIC is what enabled TMCC to continue to bill Ms. Mensie for vehicle loan payments for many months, up until her vehicle was totaled. Clearly TMCC was a party to the RIC.

36. It is just as clear that Ms. Mensie's GAP Contract is <u>an amendment to the RIC</u>. The Gap Contract makes that very clear at the top of the first page where it states in bold letters:

> THIS IS AN **AMENDMENT TO THE RETAIL INSTALLMENT SALES CONTRACT** OR LEASE CONTRACT (REFERRED TO AS THE "CONTRACT") BETWEEN THE DEALER AND YOU, THE CUSTOMER, LISTED BELOW AND COVERS ONLY THE ORIGINAL CONTRACT FOR THE PURCHASE/LEASE OF THE VEHICLE.

Ex. 4 to Doc. #1 [emphasis added].

37. The Gap Contract also states in bold letters in the top left corner that it is a "CONTRACT AMENDMENT." Ex. 4 to Doc. #1.

38. The terms of the Gap Contract clearly state that, "If you purchase optional GAP and pay the GAP Charge shown above, **Your Contract with the Dealer is amended** by adding the following . . .." *Id.* [emphases added]. Ex. 4 to Doc. #1.

39. The Gap Contract terms specifically recognize that the contract would be assigned to an auto finance company (i.e., such as TMCC) in the definitions section of the contract.[5] In fact, under the express terms of the Gap Contract, subsequent assignees of the Gap Contract (such as TMCC) specifically <u>agree to be subject to any claims</u> by borrowers, such as Ms. Mensie:

> **We** agree to assign any and all rights under this Amendment to any assignee of the Contract covered by this Amendment. All holders and assignees of this consumer credit transaction are subject to all claims and defenses, which **You** could assert against **Us** resulting from **Your** purchase of Guaranteed Asset Protection.

Gap Contract, Ex. 4 to Doc. #1, Section IV.

40. Although TMCC is clearly a party to the RIC and the GAP Contract by virtue of the assignment from the dealership, upon information and belief, AWS is the entity that issued and sold the GAP Contract to Ms. Mensie,[6] along with TMCC.

41. Upon information and belief, AWS is a proper party to Ms. Mensie's breach of contract action,[7] along with TMCC.

42. With respect to the marketing, sales, issuance, administration and breach of the GAP Contracts, defendants acted in a principal/agent relationship or alternatively, were joint venturers or partners with respect to their GAP Contracts.

43. On April 25, 2015, Ms. Mensie's vehicle was involved in an auto accident. Her primary auto insurance carrier deemed Ms. Mensie's vehicle a total loss and paid TMCC, the lien

---

[5] *See* Ex. 4 to Doc. #1, Section III, Definitions, (definition of "We, Us and Our").
[6] *See* TMCC's Motion to Dismiss, Doc. # 16, p. 2; TMCC's Memo in Support of Motion To Dismiss, Doc. # 17, p. 2, 4, 9 and 15; TMCC's Reply in Support of Motion to Dismiss, Doc. # 22, p. 2, 10.

holder for Ms. Mensie's vehicle, $24,431.45 as the value of Ms. Mensie's vehicle at the time of the accident.

44.     At that time, Ms. Mensie still owed TMCC approximately $38,100 for her vehicle under the RIC.

45.     TMCC refunded Ms. Mensie approximately $4,000 for the unused portion of a Mechanical Repair Agreement and a Prepaid Maintenance Agreement. Thus, there existed an approximate $10,000 "gap" between the $34,100 Ms. Mensie owed under her RIC and her "actual cash settlement" from American Family in the amount of $24,431.45.

46.     Contrary to the terms of the GAP Contract, defendants did not waive Ms. Mensie's liability for the $10,000 "gap." Instead, defendants waived $7,997.48 and notified Ms. Mensie that she was liable for the remaining $2,328.42 owed under the RIC. *See* Exhibit 5 to Doc. #1.

47.     Defendants' refusal to waive the full amount of the "gap" on Ms. Mensie's vehicle is contrary to the express terms of the GAP Contract.

48.     Indeed, in the same "explanation" where AWS informed Ms. Mensie that she owed more than $2,000 in a deficiency balance, AWS acknowledged to Ms. Mensie that TMCC had agreed to take her insurance payment as **"full settlement"** of her deficiency balance other than four specific exceptions, none of which applied to Ms. Mensie:

> Your GAP contract amended your loan contract so that in the event of a total loss, your lender agreed to accept your physical damage insurer's settlement, as of the Date of Loss, **as full settlement of your loan account**. Your GAP contract pays any resulting termination deficiency with the exception of:
> - Deductible over a specified amount;
> - Late payments and/or charges;

---

[7] Pursuant to the Court's June 27, 2017 Order (Doc. # 26), Plaintiff has added AWS as a defendant to this case.

- Refundable portions of any cancelable contracts that were included in your loan (such as mechanical repair, credit life insurance or prepaid maintenance),
- Interest occurring after the Date of Loss.

Ex. 5 to Doc. #1, p. 2, ¶ 4 [emphasis added].

49. Defendants' refusal to waive the full amount of the "gap" on Ms. Mensie's vehicle has caused her pecuniary damage.

50. Upon information and belief, defendants' interpretation and construction of Ms. Mensie's GAP Contract is uniform and consistent with how defendants have interpreted and construed all other GAP Contracts sold to class members.

51. The GAP Contract was drafted, prepared, promulgated and sold by defendants and as such, any and all ambiguities in the GAP Contract must be construed against defendants.

## CLASS ACTION ALLEGATIONS

52. Unless otherwise specifically stated herein, and pursuant to Fed.R.Civ.P. 23(b)(3), this action is instituted by Plaintiff on behalf of herself and all other persons that purchased a GAP Contract from defendants on or after July 1, 2009. For purposes of Count II, Plaintiff also seeks a subclass of Arkansas persons that purchased a GAP Contract on or after July 1, 2009.

53. Upon information and belief, the class referenced above includes thousands of putative class members residing throughout the United States and therefore, the class is so numerous that joinder of all members of the class would be impractical.

54. The claims for relief asserted herein on behalf of Plaintiff and the putative class members present questions of law and fact common to the class, including:

    a. Whether defendants breached their GAP Contract by virtue of the manner in which they waived, and refused to fully waive, borrower liability in situations involving a total loss;

    b. Whether defendants breached the duty of good faith and fair dealing implied within the GAP Contract by virtue of the manner in which they waived, and refused to fully waive, borrower liability in situations involving a total loss;

    c. Whether defendants violated the Arkansas Deceptive Trade Practices Act (ADTPA) by virtue of the manner in which they waived, and refused to fully waive, borrower liability in situations involving a total loss;

    d. Whether defendants' acts and omissions have caused damage to Plaintiff and the class, and

    e. Whether injunctive relief is warranted to prevent defendants from causing future harm.

55. The claims of Plaintiff are typical of the claims of the putative class and the putative subclass in that:

    a. Plaintiff and the putative class members entered into the exact same standardized, written, form GAP Contract, which contained the same or substantially similar terms and conditions, and which was prepared solely by defendants;

    b. Defendants' interpretation and construction of the GAP Contract is consistent among Plaintiff and all putative class members; and

    c. The facts common to Plaintiff and the putative class members give rise to the same claims asserted in this Complaint, including but not limited to the fact that

defendants refused to fully waive borrower liability for the "gap" in situations involving a total loss.

56. Plaintiff, as a representative for the putative class, will fairly and adequately protect the interests of the putative class because:

   a. Plaintiff has knowledge regarding the facts and circumstances that give rise to her claims and the claims of the putative class members;

   b. Plaintiff is strongly interested and highly motivated to assert and protect her own rights and the rights of the putative class in a vigorous fashion; and

   c. Plaintiff has retained class counsel with substantial experience and expertise in class actions, commercial litigation and business litigation and which have the necessary and requisite resources. These law firms will vigorously assert and protect the interests of the putative class members.

57. The questions of law and/or fact common to Plaintiff and the putative class members predominate over any questions affecting only individual members of the class, and a class action as asserted herein is superior to other available methods for the fair and efficient adjudication of this controversy, in that, among other elements:

   a. The interests of Plaintiff and the interests of individual class members in controlling the prosecution of separate actions are outweighed by the advantages of adjudicating the common issues of fact and law by means of a class action;

   b. Upon information and belief, there are no pending certified class actions concerning the controversy at issue or the claims asserted in this case applicable to Plaintiff, or the putative class members set forth herein;

    c. Concentrating litigation of these claims in this forum is desirable because it will prevent and avoid a duplication of effort and the possibility of inconsistent results, and this forum represents an appropriate forum to settle the controversy based on the location of Plaintiff, the nationwide spread of putative class members, the fact that defendants do substantial business in this jurisdiction, and the availability of witnesses and evidence; and

    d. Any difficulties that may be encountered in management of the class are greatly outweighed by the difficulties of handling multiple actions by individual class members; this class action is a superior method because it furthers judicial economy and efficiency and is in the best interests of Plaintiff and the putative class members.

COUNT I—NATIONWIDE CLASS<br>BREACH OF CONTRACT

Plaintiff Marian J. Mensie, for Count I of this Amended Complaint, states and alleges as follows:

58. To the extent they are not inconsistent, Plaintiff incorporates by reference the allegations set forth above as if more fully set forth herein.

59. Pursuant to the express terms of the GAP Contracts held by Plaintiff and the class members, defendants were required to waive a borrower's liability for the "gap" between the amount owed under an RIC and the actual cash settlement received from the borrower's primary auto insurance company in situations involving a total loss.

60. Plaintiff and the class members agreed to, and did, pay a premium for their GAP Contracts.

61. Plaintiffs and the class members fully performed their obligations under the GAP Contracts.

62. Defendants failed to perform and materially breached the GAP Contracts of Plaintiff and the class members by not waiving the "gap" between the amount owed under an RIC and the actual cash settlement received from the primary auto insurance company, in situations involving a total loss.

63. As a direct and proximate result of defendants' breach of the GAP Contracts of Plaintiff and the class members, Plaintiff and the class members have suffered pecuniary damages.

COUNT II—ARKANSAS SUBCLASS<br>ARKANSAS DECEPTIVE TRADE PRACTICES ACT

Plaintiff Marian J. Mensie, for Count II of this Amended Complaint, states and alleges as follows:

64. To the extent they are not inconsistent, Plaintiff incorporates by reference the allegations set forth above as if more fully set forth herein.

65. The Arkansas Deceptive Trade Practices Act, §4-88-101, *et seq.*, was enacted to prohibit, and protect persons from, deceptive, fraudulent and unfair practices.

66. Section 4-88-107, Ark. Code Ann. provides in relevant part: "(a) Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following: (1) Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model . . . (10) Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Section 4-88-108, Ark. Code Ann. Provides: "When utilized in

connection with the sale or advertisement of any goods, services, or charitable solicitation, the following shall be unlawful: (1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."

67. The acts and practices engaged in by defendants, as set forth herein, constitute unfair, deceptive and/or fraudulent business practices in violation of Chapter 4-88-101, *et. seq.*, Ark. Code Ann.

68. In refusing to waive the "gap" between the amount owed under an RIC and the actual cash settlement received from the primary auto insurance company, defendants employed deception, fraud, false pretenses, false promises, misrepresentations, unfair practices and omitted, concealed and suppressed material information and failed to inform Plaintiff and the class members of material facts in violation of Sections 4-88-107 and 108, Ark. Code Ann., including but not limited to omitted material facts that:

   a. irrespective of when their vehicles suffered a total loss, they would always be obligated to pay a deficiency balance solely due to the amount of their original loan.

   b. they were only <u>partially</u> protected from an unexpected financial obligation related to a deficiency balance, in the event of a total loss of their vehicle.

69. Defendants' unfair and deceptive acts and practices occurred in the course of conduct involving trade or commerce.

70. The aforesaid violations of the Arkansas Deceptive Trade Practices Act have caused Plaintiffs and the class members a substantial and ascertainable loss of money and/or property and other damages.

71. Defendants' conduct was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff and the class members and, therefore, warrants the imposition of punitive damages and/or penalties.

72. Plaintiff has been forced to hire attorneys to enforce her rights under the Arkansas Deceptive Trade Practices Act, and an award of attorney fees is warranted.

WHEREFORE, for the foregoing reasons, Plaintiff, individually and as a representative of a class of similarly situated individuals, prays the Court for judgment against Defendants, jointly and severally, in an amount to be determined at trial, as appropriate for:

a. compensatory, restitution and general damages in an amount that is fair, reasonable and just;

b. attorneys' fees;

c. punitive damages against all defendants;

d. costs of suit;

e. prejudgment and post judgment interest thereon; and

f. such other and further relief as the Court deems just, appropriate and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all issues stated herein, and all issues so triable.

Date: July 27, 2017.                    Respectfully submitted,

                                          */s/  Joseph A. Kronawitter*
Robert A. Horn                    AR # 28176
Joseph A. Kronawitter       (admitted *pro hac vice*)
HORN AYLWARD & BANDY, LLC
2600 Grand Boulevard, Suite 1100
Kansas City, Missouri 64108
Telephone: (816) 421-0700
Facsimile: (816) 421-0899
rhorn@hab-law.com
jkronawitter@hab-law.com

LAW OFFICES OF BRIAN TIMOTHY MEYERS
Brian Timothy Meyers     (admitted *pro hac vice*)
Brian C. McCart               (admitted *pro hac vice*)
1125 Grand Blvd., Suite 1610
Kansas City, MO  64106
(816) 842-0006
Fax # (816) 842-6623
btmeyers@btm-law.com
bmccart@btm-law.com

MOFFITT & PHILLIPS, PLLC
Michael B. Phillips             AR # 06255
204 Executive Court, Suite 100
Little Rock, AR 72205
Telephone: (501) 255-7406
Facsimile: (866) 460-5744
mphillips@moffittandphillips.com

                       **Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

     I hereby certify that on July 17, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all person registered for ECF as of that date.

                                               */s/ Joseph A. Kronawitter*